James B. Gottstein, Esq.
406 G Street, Suite 206
Anchorage, AK 99501
Phone: (907) 274-7686
Fax: (907) 274-9493
e-mail: jim.gottstein@psychrights.org

*Attorney for Relator, Law Project for Psychiatric Rights*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>    *Ex rel.* Law Project for Psychiatric<br>    Rights, an Alaskan non-profit<br>    corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>OSAMU H. MATSUTANI, MD, *et al.*,<br><br>    Defendants. | Case No. 3:09-CV-00080-TMB |

PSYCHRIGHTS' RULE 26(f) CONFERENCE MEMORANDUM

Table of Contents

A. Claims ........................................................................................................................ 2
B. Settlement ................................................................................................................ 12
C. Discovery Plan ......................................................................................................... 16
D. Other Scheduling and Planning Conference Report Items ...................................... 19

## A. CLAIMS

### (1) Reimbursement Under Medicaid Is Restricted to Medically Accepted Indications

The fundamental basis for False Claims Act liability under the Complaint is Congress limited Medicaid reimbursement for outpatient prescriptions to those that are for a "medically accepted indication." A claim made to Medicaid which is not for a medically accepted indication is therefore a false claim *per se*.

This was recognized in *US ex rel Rost v. Pfizer*, 253 F.R.D. 11, 13-14 (D.Mass 2008) where the Court held:

> Medicaid can only pay for drugs that are used for a "medically accepted indication," meaning one that is either approved by the FDA or "supported by citations" in one of three drug compendia, including DRUGDEX. See 42 U.S.C. § 1396r8 (k)(3), (6); 42 U.S.C. § 1396r-8 (g)(1)(B)(I). . . . Further, each prospective Medicaid provider must agree that he will comply with all Medicaid requirements

Similarly, in *U.S. ex rel. Franklin v. Parke-Davis*, 147 F.Supp. 2d 39, 44,45 (D.Mass 2001), the Court held:

> Whether a drug is FDA-approved for a particular use will largely determine whether a prescription for that use of the drug will be reimbursed under the federal Medicaid program. Reimbursement under Medicaid is, in most circumstances, available only for "covered outpatient drugs." 42 U.S.C. § 1396b(i)(10). Covered outpatient drugs do not include drugs that are "used for a medical indication which is not a medically accepted indication." Id. § 1396r-8(k)(3). A medically accepted indication, in turn, includes a use "which is approved under the Federal Food Drug and Cosmetic Act" or which is included in specified drug compendia. Id. § 1396r-8(k)(6). See also id. § 1396r-8(g)(1)(B)(i) (identifying compendia to be consulted). Thus, unless a particular off-label use for a drug is included in one of the identified drug compendia, a prescription for the off-label use of that drug is not eligible for reimbursement under Medicaid.

(footnote omitted)

PsychRights has developed a chart of medically accepted indications for common psychiatric drugs prescribed to children and youth and invites the parties to correct any mistakes that might be contained in it. Because DRUGDEX is universally acknowledged as the most expansive of the compendia, the Medically Accepted Indications Chart is based on DRUGDEX. PsychRights has both the 2009 and 2010 versions of the American Hospital Formulary Service (AHFS) compendium, which confirms this conclusion.[1]

There can no doubt be an argument around the edges about whether certain indications are "supported" in a compendium. For example, the Medically Accepted Indications Chart takes the position that only DRUGDEX Strength of Recommendation Classes I & IIa constitute support. It can be theoretically argued that at least some of Class IIb ("The given test, or treatment may be useful, and is indicated in some, but not most, cases") indications might be considered "supported," but in order to do so, one must demonstrate in which minority of cases such a use is indicated. A review of the DRUGDEX monographs for the included drugs do not appear, as a general matter, to provide any basis for making such a determination. Thus, it is hard to see how IIb Strength of Recommendations can be considered support for the drugs in question.

The Government's Statement of Interest in Rost has a discussion of when a citation in a compendia constitutes "support," which is incorporated into ¶167 of the Complaint:

---

[1] PsychRights believes after inquiry that the United States Pharmacopeia-Drug Information (or its successor publications), is no longer being published.

> Whether a particular use is supported by a compendium depends on a
> variety of factors, including the type of drug and indication at issue, the
> compendium's assessment of the drug's efficacy in treating the indication,
> the content of the compendium citation, and the scope and outcome of the
> studies as described in the compendium

However, even in the unlikely event all of the IIb recommendations were accepted by the 9th Circuit as "support," an extremely high percentage of the prescriptions for psychotropic drugs used on children and youth and presented or caused to be presented by the defendants in this action to Medicaid during the relevant period are fraudulent.

**(2) Knowledge**

Under the False Claims Act, in order for liability to be established, the defendant must have "knowingly," presented or caused the presentation of false claims. Knowingly, is broadly defined to include (i) actual knowledge; (ii) deliberate ignorance of the truth or falsity; or (iii) reckless disregard of the truth or falsity, and no proof of intent to defraud is required. 31 U.S.C. §3729(b)(1)(a).

*U.S. v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001) made clear that all Medicaid, participants are required to know its requirements and thus have the requisite knowledge for liability purposes:

> "Protection of the public fisc requires that those who seek public
> funds act with scrupulous regard for the requirements of law...." *Heckler v.
> Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 63, 104 S.Ct.
> 2218, 81 L.Ed.2d 42 (1984). Participants in the Medicare program have a
> duty to familiarize themselves with the legal requirements for payment. Id.
> at 64, 104 S.Ct. 2218.
>
> The evidence established that Mackby was the managing director of
> the clinic. He was responsible for day-to-day operations, long-term
> planning, lease and build-out negotiations, personnel, and legal and ac-
> counting oversight. It was his obligation to be familiar with the legal

requirements for obtaining reimbursement from Medicare for physical therapy services, and to ensure that the clinic was run in accordance with all laws. His claim that he did not know of the Medicare requirements does not shield him from liability. By failing to inform himself of those requirements, particularly when twenty percent of Asher Clinic's patients were Medicare beneficiaries, he acted in reckless disregard or in deliberate ignorance of those requirements, either of which was sufficient to charge him with knowledge of the falsity of the claims in question.

### (3) Public Disclosure Bar

Currently, the non-public transactions forming the basis of the complaint are contained in paragraph 203 of the Complaint, which were obtained through an Alaska Freedom of Information Act request. Under *United States v. Catholic Healthcare West*, 445 F.3d 1147, 1156 (9th Cir. 2006), this is not a disqualifying public disclosure:

> We hold that whether a document obtained via FOIA request should invoke the jurisdictional bar should be determined by reference to the nature of that document itself. If the document obtained via FOIA request is a public disclosure of a "criminal, civil, or administrative hearing, ... a congressional, administrative, or [General] Accounting Office report, hearing, audit, or investigation, or [is] from the news media," then the jurisdictional bar is applicable. If, as was the case here, the document obtained via FOIA does not itself qualify as an enumerated source, its disclosure in response to the FOIA request does not make it so.

In fact, no state FOIA response is a disqualifying public disclosure under *Catholic Healthcare*.

### (4) Particularity

Complaints under the False Claims Act must meet the particularity requirement of F.R.C.P. 9(b). *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001). The requirement is described as follows in *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997):

> We hold that the complaint meets the particularity requirement of Rule 9(b). Overall, the complaint " 'identifies the circumstances of the alleged fraud so that defendants can prepare an adequate answer.' "

*U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051-52 (9th Cir. 2001):

> Rule 9(b) may not require Lee to allege, in detail, all facts supporting each and every instance of false testing over a multi-year period. See *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (Where complaint asserting claims of improper revenue recognition identified (i) some of the specific customers defrauded, (ii) the type of conduct at issue, (iii) the general time frame in which the conduct occurred, and (iv) why the conduct was fraudulent, it was "not fatal to the complaint that it [did] not describe in detail a single specific transaction ... by customer, amount, and precise method.").

The Government's Statement of Interest in *Rost* also discusses the particularity requirement:

> [T]he identification of specific false claims is not an absolute prerequisite to satisfying the particularity requirement of Rule 9(b) in FCA cases. So long as the complaint as a whole is sufficiently particular to strengthen the inference of fraud beyond possibility, a court may conclude, as this one has in other cases, that Rule 9(b) is satisfied.

The Complaint in this case more than meets the particularity requirement under F.R.C.P. 9(b). Most particularly, the Complaint alleges that the defendants presented or caused to be presented claims to Medicaid that were not for medically accepted indications and identifies thousands of such prescriptions in Alaska alone. The Complaint also describes the broader fraudulent scheme in which the specific defendants were participants, whether wittingly so or not.

These allegations are certainly sufficient to allow the defendants to prepare an adequate answer. Either they did or did not present or cause to be presented claims to

Exhibit A
Page 6 of 20

Medicaid for prescriptions during the relevant period (since April 27, 2003) that were not for "medically accepted indications." It is very simple. All of the defendants did, although the liability of Thomson Reuters (HealthCare) derives from a more indirect causing of the false claims of a similar nature to that which resulted in (a) Eli Lilly paying $1.4 Billion in criminal and civil fines for promoting Zyprexa's use on children and youth, among others, and (b) Pfizer paying $2.3 Billion for promoting a number of drugs for uses that were not for medically accepted indications, including Geodon for use on children and youth for which there is no medically accepted indication.

PsychRights is also prepared to identify specific prescriptions that constitute false claims in an amended complaint.[2]

## (5) Damages

Under 31 U.S.C. §3729(a) each defendant is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains for each prescription to a child or youth that is not for a medically accepted indication that such defendant presented or caused to be presented to Medicaid.

### (a) Psychiatrist Defendants

The following is a calculation of the damages due for one psychiatrist defendant's prescriptions to <u>one patient</u>:

---

[2] In *Bly-Magee*, 236 F.3d at 1019, the 9th Circuit noted, "We consistently have held that leave to amend should be granted unless the district court "determines that the pleading could not possibly be cured by the allegation of other facts."

PsychRights Rule 26(f) Conference Memo                                                                 Page 7

Exhibit A
Page 7 of 20

| Date | Drug | Amount | Pharmacy |
|---|---|---:|---|
| 10/26/2004 | Trazadone | $ 11.01 | Safeway |
| 11/9/2004 | Abilify | $ 335.70 | Safeway |
| 11/19/2004 | Zoloft | $ 163.49 | Safeway |
| 12/3/2004 | Trazadone | $ 11.01 | Safeway |
| 12/6/2004 | Zoloft | $ 163.49 | Safeway |
| 12/27/2004 | Abilify | $ 171.65 | Safeway |
| 12/28/2004 | Trazadone | $ 11.01 | Safeway |
| 1/11/2005 | Zoloft | $ 171.38 | Safeway |
| 1/19/2005 | Abilify | $ 335.00 | Safeway |
| 1/25/2005 | Trazadone | $ 14.43 | Safeway |
| 2/9/2005 | Zoloft | $ 179.56 | Safeway |
| 2/15/2005 | Abilify | $ 335.70 | Safeway |
| 2/24/2005 | Trileptal | $ 132.29 | Safeway |
| 2/26/2005 | Trazadone | $ 14.43 | Safeway |
| 3/7/2005 | Zoloft | $ 179.56 | Safeway |
| 3/17/2005 | Abilify | $ 335.70 | Safeway |
| 3/24/2005 | Trileptal | $ 194.65 | Safeway |
| 4/7/2005 | Trazadone | $ 14.43 | Safeway |
| 4/18/2005 | Abilify | $ 335.70 | Safeway |
| 4/23/2005 | Trileptal | $ 198.99 | Safeway |
| 5/10/2005 | Trazadone | $ 14.43 | Safeway |
| 5/10/2005 | Zoloft | $ 179.56 | Safeway |
| 5/16/2005 | Abilify | $ 335.70 | Safeway |
| 5/21/2005 | Trileptal | $ 210.55 | Safeway |
| 6/8/2005 | Trazadone | $ 12.56 | Prescription Ctr. |
| 6/8/2005 | Zoloft | $ 181.11 | Prescription Ctr. |
| 6/20/2005 | Abilify | $ 335.70 | Safeway |
| 7/5/2005 | Trileptal | $ 210.55 | Safeway |
| 7/18/2005 | Zoloft | $ 179.56 | Safeway |
| 7/26/2005 | Abilify | $ 335.70 | Safeway |
| 8/9/2005 | Zoloft | $ 179.56 | Safeway |
| 8/19/2005 | Trileptal | $ 210.55 | Safeway |
| 8/20/2005 | Trazadone | $ 14.43 | Safeway |
| 8/31/2005 | Abilify | $ 350.45 | Safeway |
| 9/19/2005 | Trazadone | $ 11.01 | Safeway |
| 9/19/2005 | Trileptal | $ 210.55 | Safeway |
| 9/19/2005 | Zoloft | $ 179.56 | Safeway |
| 9/29/2005 | Abilify | $ 350.45 | Safeway |

| | | | | |
|---|---|---|---|---|
| 10/19/2005 | Trazadone | $ | 11.01 | Safeway |
| 10/19/2005 | Trileptal | $ | 210.55 | Safeway |
| 10/19/2005 | Zoloft | $ | 179.56 | Safeway |
| 10/22/2005 | Abilify | $ | 350.45 | Safeway |
| **Total Cost of Prescriptions** | | $ | 7,562.73 | |
| **Trebled Cost of Prescriptions** | | $ | 22,688.19 | |
| No. of Rx times $5,500 | | $ 231,000.00 | | |
| No. of Rx times $11,000 | | $ 462,000.00 | | |
| **Total Minimum FCA Damages** | | $ 253,688.19 | | |
| **Total Maximum FCA Damages** | | $ 484,688.19 | | |

Every psychiatrist defendant has had at least dozens of such patients during the relevant period, most hundreds, and some perhaps thousands. This particular patient/customer was given these prescriptions that were not for a <u>medically accepted indication</u> for just a year, while many patients/customers have such prescriptions for many years. The statute of limitations for this action is April 27, 2003, so at this point there is such liability for almost seven years.

### (b) Provider Defendants

The same type of calculation would apply to each patient/client of the provider defendants.

### (c) Pharmacy Defendants

The above type of calculation would also apply to pharmacies for <u>every customer throughout the United States</u>, except that in the above particular calculation, because two of the prescriptions were filled by a pharmacy other than Safeway, Safeway's total liability for the false claims it submitted for this <u>one customer</u> would be reduced by the damages attributable to those two prescriptions. The pharmacy defendants have at least tens of thousands of such customers nation-wide during the relevant period, more likely

hundreds of thousands, or even a million or more. Or estimated another way, each of the pharmacy defendants, with the possible exception of Fred Meyer, has no doubt presented over one million false claims for reimbursement by Medicaid for prescriptions to children and youth that were not for medically accepted indications. Using the one million false claims figure, the minimum total liability is $5.5 Billion, plus triple the cost of the prescriptions.

### (d) Defendants Administering State Programs Presenting or Causing the Presentment of False Claims (Sandoval & McComb)

The same type of calculation would be involved with respect to children and youth participating in programs that are under Ms. Sandoval's and Mr. McComb's purview, which presented or caused to be presented claims for reimbursement by Medicaid of prescriptions for psychotropic drugs to children and youth that are not for <u>medically accepted indications</u>.[3]

### (e) Defendants Approving the Presentment of False Claims (Hogan & Streur)

While the same type of calculation also applies to all claims defendants Hogan & Steuer presented or authorized to be presented to Medicaid for reimbursement, a rough order of magnitude of which can be estimated from just two classes of drugs from the <u>State of Alaska Freedom of Information Act response</u> as follows.

---

[3] It might be noted here that since September of 2008, defendants Sandoval and McComb, as well as Hogan and Streur, have actual knowledge that such claims they were causing were false because they are defendants in <u>*PsychRights v. Alaska*, Case No. 3AN 08-10115CI, Third Judicial District, State of Alaska</u>, now on appeal, and ¶ 22 of the <u>Amended complaint</u> in that action is specifically about the Medicaid reimbursement limitation to <u>medically accepted indications.</u>

| Dates | Anti-Convulsants | | 2nd Generation Neuroleptics | |
|---|---|---|---|---|
| | Claims per Month | Amount Per Month | Claims per Month | Amount Per Month |
| 12/1/2004 to 2/28/05 | 1,393 | $ 122,224 | 1,532 | $ 277,746 |
| 1/1/2005 to 3/31/2005 | 1,402 | $ 123,963 | 1,490 | $ 285,762 |
| 5/1/2005 to 7/31/2005 | 1,436 | $ 136,939 | 1,705 | $ 319,725 |
| 2/1/2006 to 4/30/2006 | 1,240 | $ 118,954 | 1,492 | $ 272,717 |
| 3/1/2006 to 5/31/2006 | 1,260 | $ 120,047 | 1,552 | $ 281,919 |
| 4/1/2006 to 6/30/2006 | 1,210 | $ 114,838 | 1,521 | $ 272,009 |
| 5/1/2006 to 7/31/2006 | 1,225 | $ 116,052 | 1,534 | $ 277,940 |
| 8/1/2006 to 10/31/2006 | 1,252 | $ 121,346 | 1,648 | $ 284,966 |
| 11/1/2006 to 1/31/2007 | 1,298 | $ 121,519 | 1,800 | $ 289,540 |
| 1/1/2007 to 3/31/2007 | 1,259 | $ 121,925 | 1,735 | $ 288,238 |
| 4/1/2007 to 6/30/2007 | 1,270 | $ 139,718 | 1,730 | $ 312,815 |
| Average | 1,295 | $ 123,411 | 1,613 | $ 287,580 |

The State of Alaska represented to PsychRights that it had destroyed the other reports within the time frame of PsychRights' Alaska FOIA request; however there is no doubt the same pattern and rough magnitude exists for time periods before, within, and after those set forth in the above table for the relevant time period.

There is no <u>medically accepted indications</u> for use on children and youth for the listed anti-convulsants misbranded as "mood stabilizers," with the possible exception of short term use of valproate (Depakote) in combination with aripiprazole (Abilify) during acute phases of manic or mixed episodes of youth (10 years and older) diagnosed with Bipolar I Disorder,[4] and all but a trivial percentage of prescriptions to children and youth

---

[4] There appears to be an inconsistency between there being no FDA approved indication for pediatric use of valproate and its approval of Abilify as adjunctive therapy to valproate for acute manic or mixed episodes of people diagnosed with Bipolar I Disorder.

and presented to Medicaid for reimbursement of second generation neuroleptics are false, so the damages calculation for these *per se* false claims is as follows:

| | | |
|---|---|---|
| 84 Months of Claims at $5,500 per claim | $ | 1,343,496,000 |
| 84 Months of Claims at $11,000 per claim | $ | 2,686,992,000 |
| Treble Damages for 84 Months of Anti-Convulsants | $ | 31,099,572 |
| Treble Damages for 84 Months of Neuroleptics | $ | 72,470,160 |
| **Total Minimum FCA Damages** | **$** | **1,447,065,732** |
| **Total Maximum FCA Damages** | **$** | **2,790,561,732** |

### (f) THOMSON Reuters (Healthcare)

As mentioned above, THOMSON Reuters (HealthCare)'s liability derives from a more indirect causing of the false claims of the same nature which resulted in (a) Eli Lilly paying $1.4 Billion in criminal and civil fines for promoting the use of Zyprexa on children and youth, and (b) Pfizer paying $2.3 Billion for promoting a number of drugs for uses that were not for medically accepted indications, including Geodon for use on children and youth for which there is no medically accepted indication. Thus, the damage calculation for THOMSON Reuters (Healthcare) depends on how many of the false claims submitted nation-wide to Medicaid for prescriptions of psychotropic drugs to children and youth that were not for a <u>medically accepted indication</u> since April 27, 2003 were caused by its continuing medical education programs and false statements in DRUGDEX.

### B. SETTLEMENT

The liability figures set forth above are, of course, staggering, but they are not out of line with the Eli Lilly and Pfizer settlements. Because PsychRights' objective in this litigation is to stop the harm to children and youth caused by the prescribing of

psychotropic drugs for non-medically accepted indications presented to Medicaid for reimbursement, as contrasted with obtaining the maximum monetary recovery possible, the defendants in this case have an opportunity to settle on better terms than might otherwise be obtained. At the same time, because this is an action on behalf of the Government to recover for the Medicaid Fraud perpetrated by the defendants by presenting or causing the presentment of claims for prescriptions of psychotropic drugs to children and youth that are not for medically accepted indications, the monetary recovery must be, in PsychRights' view, both reasonable and "meaningful." What is reasonable and meaningful will depend on the status of each defendant.

The key question for each defendant, is whether PsychRights is correct that Congress limited reimbursement for outpatient drugs under Medicaid to medically accepted indications. If so, and there is not really any doubt about it, is such defendant going to deliberately, and one might say defiantly, incur minimum liability in excess of $5,500 for each such prescription going forward? For those defendants for whom the decision is not, then an agreement to that effect can be entered into along with an agreement on the penalty amount under the False Claims Act.

Another thing to consider is that should PsychRights fail to prevail on various technicalities, such as whether the psychiatrist and provider defendants had the requisite level of knowledge, that PsychRights could bring a new action(s) based on false claims that were caused after such dismissal. Such amount must be both reasonable and

meaningful, keeping in mind that while the Government has no veto power, its views will be obtained before the Court will accept such a settlement.[5]

**(1) Psychiatrist & Provider Defendants**

It is apparent that should PsychRights prevail, all of the psychiatrist and provider defendants will be wiped out financially.

With respect to the psychiatrist defendants, what PsychRights considers a reasonable and meaningful amount will depend on the psychiatrist's culpability, net worth, and the extent to which such psychiatrist submitted false claims.

With respect to the provider defendants, <u>for settlement purposes</u>, PsychRights recognizes that some of them operate on a very thin working capital cushion, which will be taken into account.

With respect to both the psychiatrist and provider defendants, earlier settlers will tend to receive more favorable settlement terms than later settlers.

**(2) Pharmacy Defendants and THOMSON Reuters (HealthCare)**

In the 9th Circuit, under *U.S. ex rel. Killingsworth v. Northrop Corp.*, 25 F.3d 715 (9th Cir. 1994), unlike in the 5th Circuit[6] and the 6th Circuit,[7] since the Government has declined intervention, it has no veto power over settlements. Particularly for the national and regional pharmacy defendants, this provides an especially good opportunity to cap their total federal liability <u>nation-wide</u> on more favorable terms than might otherwise be obtained for their presenting false claims to Medicaid for reimbursement of prescriptions

---

[5] *See*, Docket No. 16, ¶7.
[6] *Searcy v. Philips Electronics North America Corp.*, 117 F.3d 154 (5th Cir. 1997).
[7] *U.S. v. Health Possibilities, P.S.C.*, 207 F.3d 335 (6th Cir. 2000).

of psychiatric drugs to children and youth that were not for medically accepted indications. The same is true for the false claims caused to be presented by THOMSON Reuters (Healthcare). In light of the Government's declination to intervene and PsychRights' settlement standard of reasonable and "meaningful," it seems likely that any settlement worked out between PsychRights and any defendant(s) would pass Government muster. Any such settlement must, of course, include agreeing not to present or cause the presentment of claims to Medicaid for reimbursement of prescriptions to children and youth that are not for <u>medically accepted indications</u> going forward.

### (3) State Employee Defendants

One suspects the state employee defendants will be surprised and dismayed to learn that while the State of Alaska <u>may</u> be immune from False Claims Act liability under the 11th Amendment, it is clear they are personally liable.[8] To the extent the State of Alaska is indemnifying these defendants for their personal liability, maximum recovery will be sought with continuing executions against these defendants' assets contemplated. Otherwise, much the same considerations as with respect to the psychiatrist defendants will apply.

---

[8] *Stoner v. Santa Clara County Office of Educ.*, 502 F.3d 1116, 1122, 1123 & 1124 (9th Cir. 2007).

PsychRights Rule 26(f) Conference Memo Page 15

## C. DISCOVERY PLAN

**(1) What changes should be made in the timing, form, or requirement for disclosures under Rule 26(a), including a statement of when initial disclosures were made or will be made;**

### (a) Time for Initial Disclosures

The time for initial disclosures in F.R.C.P. 26(a)(1)(C) is acceptable to PsychRights.

### (b) Indemnity Agreements

PsychRights proposes the disclosures under F.R.C.P. 26(a)(1)(A)(iv) should be expanded to include any kind of indemnity agreement, whether an insurance agreement or not.

**(2) Subjects On Which Discovery May Be Needed, When Discovery Should Be Completed, And Whether Discovery Should Be Conducted In Phases Or Be Limited To Or Focused On Particular Issues;**

Without limiting its right to conduct discovery as to other subjects, PsychRights contemplates the three main subjects of discovery by PsychRights will pertain to (a) damages, which will primarily involve discovery of the claims presented or caused to be presented to Medicaid for reimbursement of psychiatric drug prescriptions to children and youth by the defendants that were not for medically accepted indications, (b) participation in the fraudulent scheme including (i) contacts and contracts with drug companies and their representatives, (ii) compensation from drug companies, such as, without limiting its generality, for giving presentations, (iii) continuing medical education programs, who paid for them, participants, and the content of such programs, and (c) discovery that may be necessary to address prospective motions to dismiss.

(3) **Any Issues About Disclosure Or Discovery Of Electronically Stored Information, Including The Form Or Forms In Which It Should Be Produced.**

PsychRights proposes that all discovery be produced in electronic format as follows. Hard copy documents, provided in Acrobat format, which has been processed with reasonably up-to-date optical character recognition software. Data be produced in SQL database format compatible with standard Windows operating system SQL database software tools, with all fields defined, any applicable lookup tables provided, and all other information required to process, understand and interpret the data provided.

It is anticipated some of the databases will be quite large and to the extent any file won't fit on a standard DVD, PsychRights proposes that unless some other mechanism is feasible, and subject to agreement by the producing party and PsychRights to some other mechanism, that the producing party notify PsychRights of the size of the production and PsychRights provide a hard drive large enough to accommodate the production.

(4) **Issues About Claims Of Privilege Or Of Protection As Trial-Preparation Materials.**

It seems any such claims can be raised as they come up if they do so.

(5) **What Changes Should Be Made In The Limitations On Discovery Imposed Under The Rules Or By Local Rule, And What Other Limitations Should Be Imposed**

It should be made clear that the limitations on discovery imposed on Plaintiff under the F.R.C.P. or local rules, apply separately to each defendant. Otherwise, PsychRights believes the limitations contained in the F.R.C.P. or local rules are fine, subject to agreement by the affected parties or application to the Court to vary them.

The defendants should coordinate their discovery requests to eliminate duplication.

**(6) Other Orders That The Court Should Issue Under Rule 26(c) Or Under Rule 16(b) And (c).**

The form of Qualified HIPAA Protective Order proposed by PsychRights, or as otherwise agreed to, should be entered pursuant to Rule 26(c).

It seems to PsychRights the Court should conduct a scheduling conference for purposes of entering the Scheduling Order under F.R.C.P. 16(b).

Most importantly, it seems to PsychRights it would be beneficial to the Court, and the orderly management of the case, to enter an order under F.R.C.P. 16(b)(3)(vi) setting a schedule for filing pre-Answer motions, opposition(s) and other potential responses, such as amending the complaint, and replies.

A potential schedule could be:

- March 15, 2010--motions to dismiss and/or answers due.
- April 15, 2010--opposition(s) and amended complaint, or 30 days after the last motion to dismiss is filed, which ever is later.
- April 30, 2010-replies to opposition(s) to motions to dismiss due, or 15 days after the opposition(s) to the motions to dismiss is filed.

However, we might want to push this out a bit because not all of the defendants have been served and it appears the names of two corporate entities need to be changed and the correct entities served.

PsychRights can deal with multiple motions essentially making the same arguments, but it might be useful to the Court for there to be some consolidation of motions by different classes of defendants in order to reduce such duplication.

### D. OTHER SCHEDULING AND PLANNING CONFERENCE REPORT ITEMS

#### (1) Expected Contested Issues of Fact and Law at Trial

PsychRights expects this case will be decided on summary judgment, with the possible exception of issue of how many false claims for psychotropic drugs prescribed to children and youth that were not for a medically accepted indication were caused by THOMSON Reuters (HealthCare).

#### (2) Alternative Dispute Resolution

PsychRights supports an "Early Neutral Evaluation" to the extent any defendants might elect to participate.

#### (3) Trial

If we try the case and all defendants are still in, PsychRights estimates it will take two days for each defendant to present its affirmative case, inclusive of 5 days of general testimony. In other words, approximately 60 trial days. To the extent that defendants settle, figure on the 5 days of general testimony, plus 2 days for each defendant, except THOMSON Reuters (HealthCare), which might take five days for PsychRights to put on its affirmative case.

We might consider suggesting the trial be broken up by defendant classes and defendants, so that the jury would separately consider the liability of each defendant.

This would be like bifurcating liability and damages, except that it would be by defendant.

More fundamentally, maybe we should suggest that trial length estimate be deferred until it may be estimated with more accuracy.

DATED: February 22, 2010.

<div style="margin-left:2em;">
Law Project for Psychiatric Rights

By: _____
James B. Gottstein, Esq.
Attorney for *Relator*, Law Project for Psychiatric Rights
406 G Street, Suite 206
Anchorage, AK 99501
Phone: (907) 274-7686
Fax: (907) 274-9493
e-mail: jim.gottstein@psychrights.org
</div>